

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-19-00015-CV

_____

TONY COLEMAN, Appellant

V.

OTESE LTD., Appellee

On Appeal from the 96th District Court
Tarrant County, Texas
Trial Court No. 096-291699-17

Before Sudderth, C.J.; Womack and Wallach, JJ.
Memorandum Opinion by Justice Wallach

# MEMORANDUM OPINION

Appellant Tony Coleman sued Appellee Otese, Ltd.[1] (d/b/a Texas Raceway) for injuries he sustained on August 28, 2015, at a drag strip Otese owned.[2] The trial court granted no-evidence and traditional summary judgment for Otese. In two issues, Coleman argues that the trial court erred by granting traditional summary judgment on Otese's affirmative defense of release and by granting no-evidence and traditional summary judgment for Otese on Coleman's negligence and gross negligence claims.

We affirm in part and reverse in part. Because Coleman's summary judgment evidence did not raise a genuine issue of material fact on gross negligence, we affirm the trial court's no-evidence summary judgment on that claim. However, we reverse the no-evidence and traditional summary judgments on Coleman's negligence claim because Otese's summary judgment evidence did not establish as a matter of law that Coleman released his negligence claim and because the summary judgment evidence raised a fact issue on that claim.

---

[1]Appellee asserts that it was incorrectly named "Otese, Ltd." in the trial court and that the correct spelling of its name is "Oteese, Ltd." It spelled its name that way in some of its filings in the trial court. However, it also asserted in the trial court that the correct spelling of its name is "Otesee, Ltd." For consistency, we spell Appellee's name as "Otese."

[2]Coleman also sued Hielscher Racing, Inc. and Cynthia Hielscher McMillan but later nonsuited those claims. Coleman's alleged common-law wife was at one point, a plaintiff in the suit, but she has not appealed the trial court's summary judgment dismissing her claims.

## Background

In Coleman's third amended petition, he alleged that at the time of the racing accident that caused his injuries, he was engaged in a sponsored drag race at Texas Raceway. The race immediately prior to Coleman's had ended in a crash (the earlier accident), which, according to Coleman, caused motor oil and other substances to spill onto the track lanes on which Coleman subsequently drove during his race. Coleman alleged that while Texas Raceway workers attempted to clean up the fluids from the earlier accident, their attempt was ineffective, leaving the track slick and unsafe, and that because of this unsafe condition, he lost control of his vehicle during his race and crashed into a retaining wall. The crash caused a fire and Coleman suffered severe burns and orthopedic injuries. Coleman asserted claims for negligence and gross negligence for Otese's failure to adequately clean the unsafe track conditions, provide appropriate fire-fighting equipment, provide appropriate medical personnel and equipment, and provide an adequately-designed safety retaining wall.

Otese filed a combined no-evidence and traditional summary judgment motion. As no-evidence grounds, Otese asserted that there was no evidence that Texas Raceway breached any alleged duty to Coleman, that any breach proximately caused Coleman's injuries, or that Otese acted with malice or in a grossly negligent manner. As traditional grounds, Otese asserted that the summary judgment evidence defeated Coleman's claims on the merits because the evidence conclusively demonstrated that it did not breach any duty owed to Coleman, that any breach did not proximately

3

cause his injuries, and that Coleman's own negligence was the sole cause of his accident.

Otese further asserted as a traditional summary judgment ground that its summary judgment evidence established as a matter of law the affirmative defense of release. Specifically, it argued that Coleman's claims were barred by the doctrine of waiver or release based on his having signed two documents: a "tech card" and a "Release and Waiver of Liability, Assumption of Risk and Indemnity Agreement" (Release form).

The tech card is a document that Texas Raceway required each driver to sign before receiving the technical inspection of the driver's vehicle that Texas Raceway required before every race. The tech card states,

> In consideration for being allowed to participate in events, I affirm that I have read, understand[,] and agree to be bound by all K& K, NHRA[,] and Texas Raceway rules, regulations[,] and agreements, including, but not limited to, those contained in on [sic] the **K & K Insurance Waiver** I signed at the entrance gate, NHRA Rulebook, with specific reference, and TXR rules but not limited, to the rules, regulations[,] agreements contained in the Administration Procedures and Appeals Section of the NHRA Rulebook[,] which are incorporated herein by reference. I have the authority to bind the vehicle's owner to these terms if the owner is someone other than myself. I understand that K & K Insurance, NHRA[,] and TXR make[ ] no representations, warranties, or assurances that technical Inspections, including review of any written information, will:
> - detect every or any vehicle, equipment, clothing[,] or rule compliance problem; or
> - prevent injury, death[,] or property damage.
>
> I agree that I bear responsibility at all times to ensure the safety of the vehicle, equipment[,] and clothing in question and compliance with all

4

K&K Insurance, NHRA[,] and TXR rules, regulations[,] and agreements, including, but not limited, to those contained in the **K& K Insurance waiver**, NHRA Rulebook or TXR rules. I agree that I am in the best position to know about the construction and operation of the vehicle, equipment[,] and clothing in question, and compliance with all K& K Insurance, NHRA rules and TXR, regulations and agreements, including, but not limited, to those contained in the **K &K Insurance waiver**, NHRA rulebook[,] and TXR rules. I agree that participation in any and every aspect of the sport of drag racing is a privilege, not a right, and I wish to participate in accordance with all of the foregoing. [Emphasis added.]

According to Otese, the "K & K Insurance Waiver" language in the tech card is a reference to the Release form, which provides as follows:

IN CONSIDERATION of being permitted to compete, officiate, observe, work[,] or participate in any way in the EVENT(S) or being permitted to enter for any purpose any RESTRICTED AREA (defined as any area requiring special authorization, credentials, or permission to enter or any area to which admission by the general public is restricted or prohibited), EACH OF THE UNDERSIGNED, for himself, his personal representatives, heirs, and next of kin:

1.   Acknowledges, agrees, and represents that he has or will immediately upon entering any of such RESTRICTED AREAS, and will continuously thereafter, inspect the RESTRICTED AREAS [that] he enters, and he further agrees and warrants that, if at any time, he is in or about RESTRICTED AREAS and he feels anything to be unsafe, he will immediately advice the officials of such and if necessary will leave the RESTRICTED AREAS and/or refuse to participate further in the EVENT(S).

2.   HEREBY RELEASES, WAIVES, DISCHARGES[,] AND COVENANTS NOT TO SUE the . . . track operators, track owners, . . . [and] owners and [lessees] of premises used to conduct the EVENT(S), . . . herein referred to as "Releasees," FROM ALL LIABILITY TO THE UNDERSIGNED . . . FOR ANY AND ALL LOSS OR DAMAGE, AND ANY CLAIM OR DEMANDS THEREFOR ON ACCOUNT OF INJURY TO THE PERSON OR PROPERTY OR RESULTING IN DEATH OF THE UNDERSIGNED ARISING OUT OF OR

5

RELATED TO THE EVENT(S) WHETHER CAUSED BY THE NEGLIGENCE OF THE RELEASEES OR OTHERWISE.

3. HEREBY AGREES TO INDEMNIFY AND SAVE AND HOLD HARMLESS the Releasees and each of them FROM ANY LOSS, LIABILITY, DAMAGE, OR COSTS they may incur arising out of or related to the UNDERSIGNED'S INJURY OR DEATH, WHETHER CAUSED BY THE NEGLIGENCE OF THE RELEASEES OR OTHERWISE.

4. HEREBY ASSUMES FULL RESPONSIBILITY FOR ANY RISK OF BODILY INJURY, DEATH[,] OR PROPERTY DAMAGE arising out of or related to the EVENT(S) whether caused by the NEGLIGENCE OF RELEASEE or otherwise.

5. HEREBY acknowledges that THE ACTIVITIES OF THE EVENT(S) ARE VERY DANGEROUS and involve the risk of serious injury and/or death and/or property damage. Each of THE UNDERSIGNED, also expressly acknowledges that INJURIES RECEIVED MAY BE COMPOUNDED OR INCREASED BY NEGLIGENT RESCUE OPERATIONS OR PROCEDURES OF THE RELEASEES.

6. HEREBY agrees that this Release and Waiver of Liability, Assumption of Risk, and Indemnity Agreement extends to all acts of negligence by the Releasees, INCLUDING NEGLIGENT RESCUE OPERATIONS and is intended to be as broad and inclusive as is permitted by the laws of the State or Province in which the Event(s) is/are conducted and that if any portion thereof is invalid, it is agreed that the balance shall, notwithstanding, continue in full legal force and effect.

I HAVE READ THIS RELEASE AND WAIVER OF LIABILITY, ASSUMPTION OF RISK AND INDEMNITY AGREEMENT, UNDERSTAND ITS TERMS, UNDERSTAND THAT I HAVE GIVEN UP SUBSTANTIAL RIGHTS BY SIGNING IT, AND HAVE SIGNED IT FREELY AND VOLUNTARILY WITHOUT ANY INDUCEMENT, ASSURANCE[,] OR GUARANTEE BEING MADE TO ME AND INTEND MY SIGNATURE TO BE A COMPLETE AND UNCONDITIONAL

RELEASE OF ALL LIABILITY TO THE GREATEST EXTENT ALLOWED BY LAW.

The Release form does not define "event(s)" and does not identify itself as or mention a K & K Insurance Waiver.

In a deposition, Coleman denied signing a Release form on the day of the accident but acknowledged having signed such forms before some of his previous races at Texas Raceway, and he acknowledged that on other occasions a member of his crew had probably signed his name on a Release form. Based on the Release form and the tech card, Otese asserted that Coleman's claims failed as a matter of law "under the doctrine of waiver and/or release."

In Coleman's response, he asserted that Otese breached its duty to provide a reasonably safe racing location for race participants and to have adequate and functioning fire suppression equipment present at the race track. Coleman further argued that Otese had failed to meet its burden to establish waiver. He directed the trial court to summary judgment evidence to support his allegations about the conditions of the track before his race, inadequate clean-up efforts by Texas Raceway employees, and the lack of adequate fire-fighting equipment and personnel employed by Texas Raceway.

The trial court granted Otese's summary judgment motion "in all respects" and dismissed Coleman's claims. Coleman now appeals.

**Standard of Review**

## I.     Traditional Summary Judgment Motions

We review a summary judgment de novo. *Travelers Ins. v. Joachim*, 315 S.W.3d 860, 862 (Tex. 2010). We consider the evidence presented in the light most favorable to the nonmovant, crediting evidence favorable to the nonmovant if reasonable jurors could, and disregarding evidence contrary to the nonmovant unless reasonable jurors could not. *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009). We indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *20801, Inc. v. Parker*, 249 S.W.3d 392, 399 (Tex. 2008).

A defendant that conclusively negates at least one essential element of a plaintiff's cause of action is entitled to summary judgment on that claim. *Frost Nat'l Bank v. Fernandez*, 315 S.W.3d 494, 508 (Tex. 2010). Once the defendant produces sufficient evidence to establish the right to summary judgment, the burden shifts to the plaintiff to come forward with competent controverting evidence that raises a fact issue. *Van v. Peña*, 990 S.W.2d 751, 753 (Tex. 1999). A defendant is entitled to summary judgment on an affirmative defense if the defendant conclusively proves all elements of that defense. *Frost Nat'l Bank*, 315 S.W.3d at 508–09; *see* Tex. R. Civ. P. 166a(b), (c). To accomplish this, the defendant must present summary-judgment evidence that conclusively establishes each element of the affirmative defense. *See Chau v. Riddle*, 254 S.W.3d 453, 455 (Tex. 2008).

8

## II.     No-Evidence Summary Judgment Motions

After an adequate time for discovery, the party without the burden of proof may, without presenting evidence, move for summary judgment on the ground that no evidence supports an essential element of the nonmovant's claim or defense.  Tex. R. Civ. P. 166a(i).  The motion must specifically state the elements for which no evidence exists.  *Id.*; *Timpte Indus., Inc. v. Gish*, 286 S.W.3d 306, 310 (Tex. 2009).  The trial court must grant the motion unless the nonmovant produces summary-judgment evidence that raises a genuine, material fact issue.  *See* Tex. R. Civ. P. 166a(i) & 1997 cmt.; *Hamilton v. Wilson*, 249 S.W.3d 425, 426 (Tex. 2008).

As with a traditional summary judgment, when reviewing a no-evidence summary judgment, we examine the record in the light most favorable to the nonmovant, indulging every reasonable inference and resolving any doubts against the motion, crediting evidence favorable to the nonmovant if reasonable jurors could and disregarding evidence contrary to the nonmovant unless reasonable jurors could not. *Timpte Indus.*, 286 S.W.3d at 310 (citing *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 582 (Tex. 2006)); *Sudan v. Sudan*, 199 S.W.3d 291, 292 (Tex. 2006).  If the nonmovant brings forward more than a scintilla of probative evidence that raises a genuine issue of material fact, then a no-evidence summary judgment is not proper.  *Smith v. O'Donnell*, 288 S.W.3d 417, 424 (Tex. 2009); *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003).

## Discussion

### I. Otese failed to establish its affirmative defense of release.

In his first issue, Coleman challenges whether the documents relied on by Otese—one without Coleman's signature (the Release form) and one that did not contain the language required for an effective waiver or release (the tech card)—are legally sufficient to constitute a waiver or release.

#### A. Fair notice requirements apply to releases.

A release—an agreement to relieve a party of liability for its own future negligence—is an extraordinary shifting of risk, and the law therefore applies the fair notice requirements of indemnity agreements to releases. *Dresser Indus., Inc. v. Page Petroleum, Inc.*, 853 S.W.2d 505, 508 (Tex. 1993). Fair notice consists of two parts: (1) the express negligence doctrine, under which a party seeking a release from the consequences of that party's own negligence must express that intent in specific terms within the four corners of the contract, and (2) the conspicuous requirement, which mandates that something must appear on the face of the contract to attract the attention of a reasonable person looking at it. *Id.* The Supreme Court of Texas has adopted the Uniform Commercial Code's definition of conspicuousness, which provides in part that "[a] term or clause is conspicuous when it is so written that a reasonable person against whom it is to operate ought to have noticed it." *Id.* at 511. Whether a contract meets the fair notice requirements is a question of law. *Id.* at 509.

10

**B.     The summary judgment evidence did not establish as a matter of law the fair notice requirements.**

**1.     The evidence established that Coleman signed the tech card, but the tech card does not expressly contain a release and does not incorporate the Release form.**

Otese's summary judgment evidence established that Coleman signed a tech card before his race on the date of his accident; Otese attached to its motion an excerpt from Coleman's deposition testimony in which Coleman acknowledged doing so. The tech card, however, does not contain language expressing an intent to relieve Otese of liability for its own negligence.

At least one court of appeals has suggested that the fair notice requirements could be met by a release set out in a separate document when that separate document is clearly incorporated by reference into the parties' agreement. *See ALCOA v. Hydrochem Indus. Servs., Inc.*, No. 13-02-00531-CV, 2005 WL 608232, at *9 (Tex. App.—Corpus Christi–Edinburg Mar. 17, 2005, pet. denied) (mem. op.) (considering whether an indemnity was incorporated by reference into the parties' contract and holding that when the contract incorporated six other documents, and the document that contained the indemnity provision was titled "SUPPL. TERMS & CONDITIONS FORM R-380-1," the reference was insufficient to meet the conspicuousness requirement for indemnity agreements). Assuming incorporation by reference applies to releases, Otese's summary judgment arguably raised this concept as a ground. While the motion did not expressly assert that the tech card

incorporated the Release form by reference, it did assert that the "K & K Insurance Waiver" referenced in the tech card included release language. Assuming this statement sufficiently asserts incorporation by reference, reviewing the tech card's plain language, the tech card does not specifically state that it incorporates any other document into its terms. The tech card does name several other documents and asks the signer to agree to those documents, but the Release form is not identified as one of those documents.

Otese contends that the "K & K Insurance Waiver" named in the tech card is the Release form, but Otese produced no evidence establishing that fact. Nothing on the face of the Release form indicates that it is the same document as a "K & K Insurance Waiver." Nothing in the tech card tells the signer that the referenced "K & K Insurance Waiver" is the Release form. Accordingly, the tech card does not incorporate the Release form. *See id.*, at \*9; *see also Owen v. Hendricks*, 433 S.W.2d 164, 167 (Tex. 1968) (stating that an unsigned document may be incorporated by reference into a signed document if the signed document expressly refers to the unsigned document, that the language used to incorporate the other document is not important provided that the signed document plainly refers to the other document, and that the doctrine of incorporation does not permit several writings to be read together simply because they appear to relate to the same transaction); *Bob Montgomery Chevrolet, Inc. v. Dent Zone Cos.*, 409 S.W.3d 181, 189 (Tex. App.—Dallas 2013, no pet.) (noting that for purposes of incorporating a document by reference, "[p]lainly referring to a document

12

requires more than merely mentioning the document" and that "[t]he language in the signed document must show the parties intended for the other document to become part of the agreement").

Because the tech card does not incorporate the Release form by reference and does not otherwise meet the fair notice requirements, it does not constitute an effective release. *See Dresser Indus.,* 853 S.W.2d at 508.

### 2. The evidence did not establish that Coleman's crew member had actual or apparent authority to sign the Release form for him.

Otese did not use the phrase "apparent authority" in its summary judgment motion, but it did assert that Coleman acknowledged in his deposition that he had to sign a Release form before each race and also acknowledged that "others may have been relying on" his signature on the Release form. Assuming that this language sufficiently raised apparent authority as a summary judgment ground, Otese's evidence did not establish apparent authority as a matter of law.

Otese's brief cites to *NationsBank v. Dilling,* 922 S.W.2d 950, 953 (Tex. 1996) for the proposition that Coleman's crew members had authority to act on his behalf. That case is not an indemnity or release case and is therefore not directly relevant authority for whether a release may be binding on a principal if it was executed by the principal's agent who had apparent authority to do so. However, courts have suggested that apparent authority can, in some cases, bind a principal to an indemnity agreement accepted by an agent. *See Rourke v. Garza,* 530 S.W.2d 794, 802–04 (Tex.

13

1975) (holding that there was no evidence that the principal had knowledge of the indemnity provision and no evidence that the agent had apparent authority to enter into an indemnity agreement), *abrogated on other grounds by Ford Motor Co. v. Ledesma*, 242 S.W.3d 32, 45–46 (Tex. 2007); *R & R Marine, Inc. v. Max Access, Inc.*, 377 S.W.3d 780, 790 (Tex. App.—Beaumont 2012, no pet.) (same); *Expro Ams., LLC v. Sanguine Gas Expl., LLC*, 351 S.W.3d 915, 926 (Tex. App.—Houston [14th Dist.] 2011, pet. denied) (concluding that that there was a fact issue regarding whether the party relying on the indemnity provision could have reasonably believed that the other party's employee had authority to bind the other party to an indemnity provision); *Air & Pump Co. v. Almaquer*, 609 S.W.2d 309, 313 (Tex. App.—Corpus Christi 1980, no writ) (stating in one sentence, as an additional ground for holding that the indemnity provision did not apply, that "the testimony concerning the contract established that the employee of IPC who signed the delivery ticket [containing the indemnity provision] did not have authority to enter into any kind of a contract that would bind IPC"). However, an agent cannot create the authority to bind the principal; actual or apparent authority is created only by the principal's words or conduct. *First Valley Bank of Los Fresnos v. Martin*, 144 S.W.3d 466, 471 (Tex. 2004) (stating that apparent authority must be based on the acts of the principal); *Jarvis v. K & E Re One, LLC*, 390 S.W.3d 631, 640 (Tex. App.—Dallas 2012, no pet.) (noting that actual authority cannot be based merely on the words or deeds of the agent); *Greenfield Energy, Inc. v. Duprey*, 252 S.W.3d 721, 734 (Tex. App.—Houston [14th Dist.] 2008, no pet.)

14

(explaining that an agent's actual or apparent authority is created by the principal—actual authority is created by the principals' words or conduct to the agent while apparent authority is created by the principal's words or conduct to a third party).

Otese did not present any evidence of the identity of the person who signed the Release form for Coleman on the day of his accident, did not present any evidence of whether the person was one of Coleman's crew members, did not establish as a matter of law that the particular person who signed the Release form on that day had actual or apparent authority to bind Coleman to its terms, and did not establish as a matter of law that all of Coleman's crew members had actual or apparent authority to do so. The tech card includes the statement, "I have the authority to bind the vehicle's owners to these terms if the owner is someone other than myself," but the Release form does not. When asked in his deposition who had signed the Release form on the day of his accident, Coleman responded that it was "probably" one of his crew members. Coleman was asked if his crew members were authorized "to sign your name to forms like this," to which he gave the nonresponsive answer, "They normally take the vehicle, and they ask at the gate who's driving." Asked later if his crew members "would have been authorized to do that," he responded, "I'm not sure what you mean, authorized to do that." He was not asked a follow-up question to elicit more information. Coleman testified at one point in his deposition that he understood that he had to sign a tech card in order to race, but he made no such statement about the Release form. Asked if he understood that by signing the tech

15

card, he was signing a waiver form in order to race, he stated, "I understood that I was signing a tech card to get my car teched in."

This evidence is not enough to establish actual or apparent authority as a matter of law, and the record does not include other evidence establishing actual or apparent authority as a matter of law. *See Autogas Acquisitions Corp. v. Kelman*, 386 S.W.3d 355, 358–59 (Tex. App.—Dallas 2012, no pet.) (noting "[t]he test in determining the question of apparent authority is whether there is such conduct on the part of the principal as would lead a reasonably prudent person using diligence and discretion to believe that the agent had authority to act for the principal" and that "[a]pparent authority arises either from a principal knowingly permitting an agent to hold himself out as having authority or from a principal's actions [that] lack such ordinary care as to clothe an agent with the indicia of authority").

Because Otese failed to establish as a matter of law that Coleman's crew member signed the Release form on the day of the accident, that his crew member had actual or apparent authority to sign for him, that Coleman knew his crew member was signing the Release form in his place, or that the crew member was, with Coleman's knowledge, holding himself out as having the authority to sign the Release form on Coleman's behalf, Otese was not entitled to summary judgment on its affirmative defense of release. *See Exxon Mobil Corp. v. Rincones*, 520 S.W.3d 572, 589 (Tex. 2017) (noting that authority to act on the principal's behalf is an essential

16

element of agency and that agency is not presumed and must be proven by the party alleging the existence of an agency relationship); *Chau*, 254 S.W.3d at 455.

### 3. Actual knowledge obviates the conspicuousness requirement but not the express negligence requirement.

Otese did not expressly assert in its summary judgment motion that it did not have to establish fair notice requirements because Coleman had actual knowledge of the Release form's terms. It did, however, assert that Coleman had signed the Release form on previous occasions. Assuming that this assertion raised actual knowledge as a summary judgment ground, Otese nevertheless was not relieved of the requirement to meet the express negligence requirement for releases.

Whether a party had actual notice or knowledge is a question of fact. *ALCOA*, 2005 WL 608232, at *10. Because the purpose of the conspicuousness requirement for releases is to protect a contracting party from surprise and an unknowing waiver of his or her rights, conspicuousness is unnecessary when a party has actual notice of the release's terms. *Cate v. Dover Corp.*, 790 S.W.2d 559, 561 (Tex. 1990). However, for an agreement to constitute a release, the agreement must actually contain the terms of the release within its four corners. *See Dresser Indus.*, 853 S.W.2d at 508. Consequently, actual knowledge cannot substitute for the express negligence requirement, *see Blankenship v. Spectra Energy Corp.*, No. 13-12-00546-CV, 2013 WL 4334306, at *5 (Tex. App.—Corpus Christi–Edinburg Aug. 15, 2013, no pet.) (mem. op.) (quoting *Sydlik v. REEIII, Inc.*, 195 S.W.3d 329, 333 (Tex. App.—

17

Houston [14th Dist.] 2006, no pet.)), particularly when, as here, the release terms are expressed in a separate agreement not signed by the party who the proponent of the agreement seeks to bind. Accordingly, Coleman's knowledge of the terms of the Release form would obviate the need for Otese to make those terms conspicuous, but Otese still had to establish that Coleman agreed to the terms in order for Coleman to be bound by them. *See id.* Because the tech card does not contain language of release and Otese failed to establish as a matter of law that Coleman signed the Release form, Otese did not establish that the parties' agreement released Otese from liability for its own negligence.

Because Otese failed to establish as a matter of law that Coleman released his claims against it, the trial court erred by granting traditional summary judgment on this ground. *See* Tex. R. Civ. P. 166a(c); *Frost Nat'l Bank*, 315 S.W.3d at 508–09. We sustain Coleman's first issue.

## II. The summary judgment evidence raised a fact issue on Coleman's negligence claim but not his gross negligence claim.

In his second issue, Coleman asks whether the trial court erred by granting Otese's summary judgment motion "despite obvious factual disputes about the [parties'] conduct before and after the incident that is the subject of this suit."

### A. Otese challenged each of the negligence elements.

To prevail on a common-law negligence claim, a plaintiff must establish (1) a legal duty owed to the plaintiff, (2) a breach of that duty, and (3) damages proximately

18

resulting from the breach. *Dukes v. Philip Johnson/Alan Ritchie Architects, P.C.*, 252 S.W.3d 586, 591–92 (Tex. App.—Fort Worth 2008, pet. denied). In its no-evidence motion, Otese asserted that there was no evidence of any of these elements. In its traditional summary judgment motion, Otese asserted that its summary judgment evidence conclusively demonstrated that Texas Raceway did not breach a duty to Coleman, that any breach did not proximately cause Coleman's injury, and that Coleman was the sole cause of his accident.

**1. The evidence defeated Otese's right to summary judgment on negligence.**

To negate negligence as a matter of law, Otese's motion referenced Coleman's deposition testimony that he saw oil on the track from the earlier accident and watched the crew work to clean the track but did not voice any complains about the condition of the track or decline to race; that no one from Texas Raceway demanded that he race; that Coleman knew before the accident that drag racing can be dangerous; that he did not think anyone with Texas Raceway intended for the accident to happen; that Coleman acknowledged that a locking fuel cap had to be installed on his truck; that Coleman did not know if the truck he was racing was leaking fuel shortly after starting the race and that he acknowledged that the truck fishtailed or "got a little squirrely" about 60 feet past the start line; and that Coleman raced without wearing a fire-retardant racing jacket, fire-retardant racing gloves, or fire-retardant racing shoes.

19

Otese further relied on the deposition of Garry Gilland, Texas Raceway's race director and head of safety. In the deposition, Gilland stated that he and his crew at Texas Raceway had been trained on how to respond to fluid spills and had the equipment to do so and that he was at the raceway on the night of the accident. He further testified that there were no fluid spills from the earlier accident that preceded Coleman's race, and he was "very confident" that the drag strip was free of fluids before Coleman's race. Gilland also stated that the prior accident occurred past the drag strip's finish line, and that Coleman's accident happened before that point. He stated that he found a fuel cap on the drag strip after Coleman's accident; that he saw a video of Coleman's race that showed that Coleman's truck had fuel coming out of it during the race, indicating that Coleman's truck was missing its fuel cap; and that the fuel got on Coleman's tires during the race. Gilland further testified that Coleman could have refused to race; that Coleman's vehicle crossed the finish line at 122 miles per hour and that this speed indicated that his foot was on the gas at that time; that Coleman did not take his foot off the gas when his truck "got loose" (i.e., was "skating around"); and that if Coleman had taken his foot off the gas at that point, his truck would have "settled down" and would have crossed the finish line between 40 and 59 miles per hour, and the accident could have been prevented.

Coleman's summary judgment response asserted that Texas Raceway had a duty to provide a reasonably safe location for racing, that it was negligent in failing to clean the oil spill from the earlier accident, and that the negligence proximately caused

20

Coleman's vehicle to lose traction and hit a wall. He further asserted that Texas Raceway was negligent in failing to provide adequate or functioning fire-fighting equipment and in failing to adequately train fire-fighting personnel and that this negligence was a proximate cause of his injuries.

As evidence, Coleman pointed to his deposition testimony that he saw the aftermath and clean-up of the earlier accident, including seeing the car from the earlier accident being towed away from the track, and saw oil on the track from that accident and that the track's only cleanup method for the oil was to sweep and pour cat litter on the track, rather than burning off the oil. Coleman also testified that after his accident, his truck caught fire, and he was unable to get out of the truck. The first two fire extinguishers Texas Raceway workers attempted to use to put out the fire were empty. One of his own crew members broke into the truck and pulled him out.

Coleman also referenced the deposition testimony of Otese's corporate representative, who acknowledged that Otese made money from races at its track by charging the racers to participate and by selling concessions to spectators. Coleman directed the trial court to the deposition testimony of Gilland, the track's safety director, who stated that to his knowledge none of the raceway workers who worked on cleanup that night had been provided with any kind of safety manual or formal safety training. The last time the track had employee training on fire safety was in 2006, when the employees were trained on using a fire extinguisher, and that was the extent of their fire-suppression training. Gilland stated that Texas Raceway had a fire

21

truck present only for races involving methanol or if an event promoter requested one.

Coleman supplied the report of racing safety expert Martyn Thake, who stated that "[r]ace track surface clean-up and firefighting are both professional specialized activities" that "require training and understanding of procedures, desired results, materials, applications, clean-up[,] and potential hazards." He opined that the clean-up of the earlier accident "was rushed and not completed in a manner that would have eliminated the fluids deposited on the surface by the previous competitor," that the time it took for Texas Raceway workers to extinguish the fire after Coleman's accident was "unacceptable," and that "[t]he lack of professional firefighting equipment and trained personnel is negligent, and the result could have been foreseen." Thake pointed out the track's lack of dedicated firefighting apparatus and its lack of understanding that different types of fuel caused "very different types of fire and need to be attacked with different extinguishers and procedures." Thake noted that Texas Raceway's armco barrier had old posts and damaged rail that showed "obvious signs of rot, damage[,] and lack of maintenance," with "evidence of many past impacts." Thake stated that "[t]here is no reason for the rail to have separated and entered the [truck] during the crash" and that Coleman was "very lucky" that the rail "did not kill him as it went through the cab."

Thake further stated that the cleanup methods described by Gilland "could not have had a satisfactory result," that Gilland "obviously d[id] not understand" how the

22

clean-up materials employed by Otese have to be used to achieve the desired result, that the clean-up efforts described by Gilland "could not have resulted in a clean and safe track," and that just pouring absorbent material on a spill and sweeping it up "shows a lack of understanding and knowledge." Thake concluded his report by stating that Coleman's accident "was foreseeable and unnecessary," that Coleman's race "should not have been allowed to occur," and that "[i]t is obvious . . . that the clean-up was rushed and incomplete and that the firefighting equipment, personnel[,] and procedures were a joke."

Finally, Coleman included his own affidavit in which he stated that he saw Texas Raceway personnel attempting to clean up the oil caused by the earlier accident, that his truck lost traction in the area where the oil spill had occurred, and that he believed the oil spill had not been properly cleaned.[3]

---

[3]In the trial court, Otese filed a motion to strike Thake's report as untimely, which the trial court denied. Otese does not complain about this ruling on appeal. Otese does assert that Thake's affidavit does not assist Coleman because it ignored both Gilland's testimony and the fact that Coleman acknowledged not witnessing the earlier accident. Otese improperly included this assertion in its statement of facts rather than in the brief's argument section, and we are not required to consider it. *See* Tex. R. App. P. 38.1(g) (providing that the statement of facts must state the facts pertinent to the issues and must not include argument). Even considering this argument, however, we find it unpersuasive. Coleman acknowledged not seeing the earlier accident but stated that he saw the aftermath and the raceway crew's attempted cleanup, and Thake specifically noted in his report that he had reviewed Gilland's deposition with exhibits in making his report.

## 2. The evidence defeats Otese's right to judgment as a matter of law.

On the element of duty, Otese did not establish its entitlement to summary judgment as a matter of law. The traditional duty owed by a landowner to invitees applies to the owners of sports facilities. *Hathaway v. Tascosa Country Club, Inc.*, 846 S.W.2d 614, 618 (Tex. App.—Amarillo 1993, no writ). Thus, if Coleman was an invitee, Otese owed him a duty to exercise reasonable care to protect him from a dangerous condition on the premises by either adequately warning him about the condition or making the condition safe. *See Wal-Mart Stores, Inc. v. Gonzalez*, 968 S.W.2d 934, 936 (Tex. 1998) (discussing the duty a landowner owes to invitees); *Pipkin v. Kroger Tex., L.P.*, 383 S.W.3d 655, 672 (Tex. App.—Houston [14th Dist.] 2012, pet. denied) (same). To support the application of this duty to his case, Coleman produced evidence that he was at the raceway as an invitee; Coleman paid a fee to participate in the race, and, as noted above, Otese's corporate representative acknowledged that racers paid to participate in races and that Otese also made money by selling concessions to the race spectators. *Austin v. Kroger Tex., L.P.*, 465 S.W.3d 193, 202 (Tex. 2015) (defining an invitee as a person who enters another's property with the owner's knowledge and for the mutual benefit of both).

Further, Coleman produced evidence sufficient to raise a fact question about whether oil spilled on to one of the race lanes because of the earlier accident and about whether Otese's employees' attempted clean-up, the equipment provided for the clean-up, and the training provided on how to clean accident sites were all

24

inadequate. *See Pipkin*, 383 S.W.3d at 672 (holding that plaintiff produced evidence that contradicted defendant grocery store's evidence that it had completely cleaned up the spill that plaintiff alleged was a dangerous condition). Coleman also produced evidence sufficient to raise a genuine issue of material fact about whether Otese actually knew or should have known about the liquid spill and the employees' failure to ameliorate it: Coleman testified that Otese's employees attempted to clean the race lane after the earlier accident and that the employees swept and sprinkled cat litter on the track. Further, the evidence that Otese employees, aware of the spill, attempted to clean up the scene in front of onlookers, including Coleman, and then continued with the next race, raised a fact question about whether their efforts created the appearance that the racing lane had been made safe. Accordingly, Coleman produced evidence sufficient to raise a fact issue about whether Otese owed him a duty with respect to the oil spill.

Coleman also produced evidence, sufficient to raise a question of fact, about whether the fire-fighting equipment that Otese undertook to have on the premises— evidence relevant to Otese's awareness of the fire risk presented by the activities of the track—was inadequate and the employees it hired for that job were non-professionals and inadequate for the task. *See Wal-Mart Stores Tex., LLC v. Bishop*, 553 S.W.3d 648, 666 (Tex. App.—Dallas 2018) (holding that there was legally sufficient evidence from which a jury could have drawn the inference that an employee's moving and shelving products without knowledge of or training on how

25

to stock and shelve merchandise in that section of the store proximately caused a box to fall on and injure the plaintiff), *judgm't aff'd as modified by agr.*, No. 18-0702 (Tex. Sept. 7, 2018) (order) (granting the parties' agreed motion to grant the petition, modify the judgment to release surety, and affirm the judgment as modified); *Scroggs v. Am. Airlines, Inc.*, 150 S.W.3d 256, 263 (Tex. App.—Dallas 2004, no pet.) (stating that a landowner's duty to make the premises safe may give rise to liability when a person is injured by or as a contemporaneous result of a negligent activity on the premises); *see also THI of Tex. at Lubbock I, LLC v. Perea*, 329 S.W.3d 548, 573 (Tex. App.—Amarillo 2010, pet. denied) (recognizing that an employer "is liable for negligent hiring, supervision, or retention when proof is presented that the employer hired an incompetent or unfit employee whom it knew or, by the exercise of reasonable care, should have known was incompetent or unfit, thereby creating an unreasonable risk of harm to others"). Because Coleman produced sufficient evidence to raise a fact question on the issue of duty, the trial court erred by granting no-evidence summary judgment on this ground.[4] *See* Tex. R. Civ. P. 166a(i). The trial court further erred by

---

[4]This court has not directly addressed whether a no-evidence summary judgment motion may negate a negligence claim by challenging the existence of a duty; whether a duty exists is a question of law, but the court makes this determination based on the circumstances of the case. *See Austin v. Kroger Tex., L.P.*, 465 S.W.3d 193, 209 (Tex. 2015) (pointing out that whether a duty exists is a question of law for the court); *McCracken v. MonoSol RX, LLC*, No. 02-12-00151-CV, 2014WL 4937997, at *8 (Tex. App.—Fort Worth Oct. 2, 2014, no pet.) (mem. op.) (stating that a no-evidence summary judgment motion "must be based on an alleged lack of evidence" and thus no-evidence summary judgment may not be based on a pure question of law); *see also Brookshire Katy Drainage Dist. v. Lily Gardens, LLC,*

granting traditional summary judgment on this ground because, viewing the evidence in the light most favorable to Coleman, Otese's evidence on duty did not negate duty as a matter of law. *See* Tex. R. Civ. P. 166a(c).

Coleman also produced evidence of specific acts or omissions constituting a breach of duty and of causation sufficient to defeat the no-evidence and traditional summary judgment grounds challenging those elements. As noted above, Coleman produced evidence that the earlier accident resulted in an oil spill on the track, that Otese failed to adequately clean up the oil spill from the earlier accident, that Coleman's truck lost traction when it drove over the spot where the inadequately-cleaned oil spill occurred, that Otese did not have adequate and proper firefighting equipment, and that its attempts to extinguish the fire resulting from Coleman's accident were inadequate and prolonged the time in which Coleman was exposed to

357 S.W.3d 661, 673 (Tex. App.—Houston [1st Dist.] 2011, no pet.) (Keyes, J., dissenting from the court's denial of en banc reconsideration) (discussing the problem with granting a no-evidence summary judgment on a purely legal issue). *Compare Boerjan v. Rodriguez*, 436 S.W.3d 307, 311 (Tex. 2014) (holding—without discussion of whether no-evidence summary judgments may challenge questions of law—that the defendants did not owe the plaintiffs a duty, that the plaintiffs' negligence claims therefore failed as a matter of law, and that the court of appeals's reversal of the trial court's no-evidence summary judgment was therefore improper), *with Franks v. Roades*, 310 S.W.3d 615, 621 (Tex. App.—Corpus Christi–Edinburg 2010, no pet.) (stating, in case addressing whether attorney had duty under disciplinary rules of professional conduct to seek guardianship for client, that whether a duty existed was a question of law, "which is inappropriate for a no-evidence summary judgment"). Coleman does not argue that a no-evidence summary judgment may not be granted on the question of duty. Assuming that duty may be challenged in a no-evidence summary judgment motion, Coleman produced sufficient evidence to defeat Otese's right to summary judgment.

the fire resulting from the accident. Accordingly, no-evidence summary judgment on these grounds was improper. While Otese produced evidence contradicting Coleman's evidence, that evidence did not negate Coleman's evidence as a matter of law. Rather, it merely raised fact questions. The traditional summary judgment on these grounds was therefore also erroneous.

The trial court erred by granting no-evidence and traditional summary judgment on Coleman's negligence claim. *See* Tex. R. Civ. P. 166a(c), (i); *Frost Nat'l Bank*, 315 S.W.3d at 508; *Smith*, 288 S.W.3d at 424. We sustain this part of Coleman's second issue.

## B. Coleman failed to raise a fact question on gross negligence.

Otese asserted in its no-evidence summary judgment motion that Coleman's gross negligence claim failed because Coleman had no evidence that Otese acted in a grossly negligent manner.[5]

To prove gross negligence, the evidence must show that (1) from the actor's standpoint, the act or omission in question involved "an extreme degree of risk,

---

[5]Otese framed this summary judgment ground as specifically addressing Coleman's gross negligence claim, but it asserted both that there was no evidence that it acted in a grossly negligent manner and also that there was no evidence that it acted with malice. It thus challenged not only gross negligence as a basis for awarding exemplary damages but also malice as an alternative basis. *See* Tex. Civ. Prac. & Rem. Code Ann. § 41.003 (providing that "exemplary damages may be awarded only if the claimant proves by clear and convincing evidence that the harm with respect to which the claimant seeks recovery of exemplary damages results from: (1) fraud; (2) malice; or (3) gross negligence"). However, this summary judgment ground was irrelevant because Coleman's third amended petition did not plead malice.

28

considering the probability and magnitude of the potential harm to others" and (2) the actor had "actual subjective awareness of the risk involved but nevertheless proceed[ed] in conscious indifference of the rights and safety or welfare of others." *LaRue v. Chief Oil & Gas, L.L.C.*, 167 S.W.3d 866, 879 (Tex. App.—Fort Worth 2005, no pet.); *see also* Tex. Civ. Prac. & Rem. Code Ann. § 41.001(11) (defining "gross negligence" for purposes of chapter governing damages in civil cases).

Coleman's summary judgment response did not discuss gross negligence and did not direct the trial court to any evidence that Otese's alleged acts or omissions involved an extreme degree of risk or that Otese had subjective awareness of the risk but nevertheless proceeded in conscious indifference of Coleman's rights and safety or welfare. Accordingly, the trial court correctly granted no-evidence summary judgment on Coleman's gross negligence claim. *See* Tex. R. Civ. P. 166a(i); *Smith*, 288 S.W.3d at 424. We overrule the remainder of Coleman's second issue.

## Conclusion

Having sustained Coleman's first issue and having sustained in part and reversed in part his second issue, we reverse the trial court's summary judgment on Coleman's negligence claim, affirm the summary judgment on Coleman's gross negligence claim, and remand this case for further proceedings.

                                        /s/ Mike Wallach
                                        Mike Wallach
                                        Justice

Delivered:  January 23, 2020